UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRANDON K. BUCHANAN,<br><br>      Plaintiff,<br><br>  -v-<br><br>CHRISTOPHER M. DANNEN,<br><br>      Defendant. | CASE NO. 1:21-CV-_____<br><br>**AFFIDAVIT OF BRANDON BUCHANAN IN SUPPORT OF PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

I, Brandon K. Buchanan, under penalty of perjury, hereby declare as follows:

1) I am the Plaintiff in this matter, and I attest to the following facts upon my own personal knowledge.

2) I respectfully submit this Affidavit in support of the Plaintiff's Emergency Application for Preliminary Injunction and Temporary Restraining Order and to transmit true and correct copies of certain documents for the Court's consideration.

3) Attached hereto as Exhibit A is a true and correct copy of the Operating Agreement of Iterative Instinct UGP, LLC.

## FACTUAL RECITATIONS

4) I, Plaintiff Brandon Buchanan am an individual and a citizen of Miami, Florida.

5) Defendant Christopher Dannen is an individual and a citizen of New York, New York.

6) Together, Defendant and I have chartered numerous businesses together for, *inter alia*, offering investment opportunities in cryptocurrency, including the mining and trading of such cryptocurrency, the "Iterative Entities."

7) Each of the Iterative Entities has its own operating agreements, each of which provides Defendant and me co-equal interests in each of the business entities.

8) At the center of the Iterative Entities is Iterative Capital Management, L.P.

9) Management of Iterative Capital Management, L.P. resides solely with its general partner, Iterative Instinct UGP, LLC.

10) Iterative Instinct UGP, LLC itself has just two members, me and Defendant (see attached Exhibit A).

11) The Operating Agreement of Iterative Instinct UGP, LLC allocates all rights and powers of the company to the Members in the plural sense and provides no authority to direct the company unilaterally.

12) Iterative Capital Management, L.P. is the managing member of several subsidiaries, including, but not limited to, Iterative OTC, L.L.C., Iterative PoW Holdings, LLC, and Neutron Mining, L.L.C.

13) Notwithstanding the forgoing, Defendant has, without justification, unilaterally and completely excluded me from the management and operation of those businesses, to the detriment of those businesses.

14) What is more, during the time of this exclusion, I have developed reason to believe that Defendant has misappropriated assets belonging to the Iterative Entities, specifically cryptocurrency mined from company hardware during the intervening period.

15) I have made repeated overtures in order to reestablish my authority within the Iterative entities but have been consistently rebuffed. Having attempted to resolve the matter amicably, I am now forced to bring suit in order to prevent further harm to the business and my own personal interests.

16) In the Summer of 2020, Defendant and I had a falling out following an incident at Defendant's rented vacation home in which Defendant vehemently expressed his opposition to the events leading up to and surrounding the Black Lives Matter protests to me, who identifies as African-American. Defendant expressed his views with such vitriol that I feared for my physical safety and left the Vermont home to stay elsewhere. We have not met in person since.

17) On December 7, 2020, I was informed by an employee of Iterative Capital Management, L.P. that Defendant was forming plans to launch his own business with capital and intellectual property actually developed by and generated by the Iterative Entities, thereby cutting out me and current investors.

18) Alarmed, on December 8, 2020, I confronted Defendant about the preceding allegation and other issues surrounding the business.

19) Although cryptocurrency mining had been previously ongoing, on December 9, 2020, cryptocurrency ceased accumulating in the accounts associated with one of Iterative Capital Management L.P's associated entities.

20) Although cryptocurrency mining had been previously ongoing, on December 12, 2020, cryptocurrency ceased accumulating in the accounts associated with another of Iterative Capital Management L.P.'s associated entities.

21) I did not direct that any computers stop mining cryptocurrency, and indeed would not have done so.

22) On December 13, 2020, Defendant disabled my access to essentially all of my work accounts, including, but not limited to, my work email, electronic books and records, cryptocurrency accounts, and exchange accounts.

23) I have repeatedly requested that his access to these materials be restored and have been denied at every turn.

24) Significantly, through company counsel, I learned that my work emails have been permanently deleted. These deletions have taken place even though some Iterative Entities were at the time both engaged in litigation and on notice of potential future litigation.

25) After cryptocurrency ceased accumulating in the accounts of the Iterative Enterprises, I repeatedly inquired as to the lack of mining rewards, especially given that the value of the cryptocurrency being mined appeared to be appreciating significantly against the U.S. Dollar.

26) Notwithstanding my exclusion from company accounts, I was nonetheless able to independently discover the following financial activity tending to show that the cryptocurrency machines were indeed operating and thus likely generating cryptocurrency rewards on behalf of various Iterative Enterprises:

   a. On December 16, 2020, Defendant made a payment of $50,977.20 to a third-party hosting facility for the electricity used to run and operate the cryptocurrency mining computers.

   a. On December 29, 2020, Defendant made a payment of $68,627.92 to a third-party hosting facility for the electricity used to run and operate the cryptocurrency mining computers.

27) Meanwhile, on January 7, 2021, Defendant proclaimed that the Iterative Enterprises were no longer operating any cryptocurrency mining computers.

28) However, that same day, I learned from a third-party hosting facility that, contrary to Defendant's representations, the mining computers were still in fact running and operational.

29) In total, the Iterative Enterprises own thousands of cryptocurrency mining computers. When operational, these computers typically generate hundreds of cryptocurrencies in a given day. There has never been a day, to my knowledge, when an operational machine has generated zero cryptocurrency.

30) In response to my ongoing queries on the subject, Defendant nonetheless steadfastly maintained that the machines had been shut off and had indeed stopped mining and were not therefore accumulating cryptocurrency rewards.

31) Having been excluded from the Iterative Enterprises, I was forced to rely on these false statements that the machines had been idled. Had I been aware that the machines had not ceased mining, I would have pursued further inquiries regarding the results of that mining.

32) And yet, additional hosting payments to run the mining computers continued to be disbursed by Defendant on behalf of computers owned by various Iterative Entities:

   a. On January 20, 2021, Defendant sent a wire transfer to a third-party hosting facility for electricity used to run and operate the cryptocurrency mining computers.

   b. On January 25, 2021, Defendant made a payment of $74,410.70 to a third-party hosting facility for electricity used to run and operate the cryptocurrency mining computers.

   c. On February 1, 2021, Defendant made a payment of $9,298 to a third-party hosting facility for electricity used to run and operate the cryptocurrency mining computers.

   d. On February 4, 2021, Defendant made a payment of $14,023 to a third-party hosting facility for electricity used to run and operate the cryptocurrency mining computers.

33) Reviewing the publicly accessible mining pool links to Iterative Entities' miner addresses and sub-accounts, it is further evident to me that the mining computers have continued to run and operate unimpaired, and that Defendant has continued to service the invoices for their operational expenses.

34) Upon information and belief, these machines were indeed mining, and millions of dollars of mining rewards for the period in question are therefore unaccounted for. Because the mining hardware was solely within Defendant's control during the period in question, and because no mining rewards have been attributed to the Iterative Entities for that period, I believe the mining proceeds are believed to have been misappropriated by Defendant for his own personal gain.

35) I have performed all of my duties pursuant to the relevant operating agreements and contracts.

36) Defendant has nonetheless harmed me, in contravention of his contractual duties, by:
    - denying my access to my email account associated with the Iterative Entities;
    - denying my access to the Google drive associated with the Iterative Entities;
    - denying my access to the various accounts of the Iterative Entities, including bank accounts, cryptocurrency wallet accounts, cryptocurrency exchange accounts and other financial accounts;
    - denying my access to the various trade records of the Iterative Entities;
    - denying my access to the various mining computers;
    - excluding me from communications with third-parties;
    - excluding me from visibility into outbound payments to third-parties;
    - making communications and representations on behalf of the Iterative Entities without my consent;

- failing to disclose to me cryptocurrency mined on computers owned by the Iterative Entities;
- failing to disclose to me cryptocurrency trading activity related to cryptocurrency owned by the Iterative Entities;
- failing to disclose to me the status of loans held by the Iterative Entities;
- recruiting personnel employed by the Iterative Entities to work on businesses unrelated to the Iterative Entities, for Defendant's personal gain; and
- using resources of the Iterative Entities to mine cryptocurrency for Defendant's personal gain.

37) These failures and exclusions have harmed me by affecting my ability to engage in oversight or management of the Iterative Entities and by financial losses suffered by the Iterative Entities as well as personal financial losses, lost business opportunities, exposure to litigation, and reputational harm.

38) These failures and exclusions have further caused irreparable harm to the Iterative Enterprises in the form of lost business opportunities and mismanagement, which has itself caused additional financial and reputational harm to me.

39) Having been continuously rebuffed, I feel that I am without any other option but to secure an injunction requiring Defendant to adhere to the terms of the our agreement, granting me, *inter alia*, full access to my email account for the Iterative Entities, the Iterative Entities' online document database, all financial accounts and wallets for the Iterative Entities, and all cryptocurrency trading accounts for the Iterative Entities.

WHEREFORE, I, Brandon Buchanan respectfully request that the proposed relief set forth in the Proposed Order to Show Cause for Preliminary Injunction and Temporary Restraining Order be granted.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief.

Dated: Miami, Florida

March 17, 2021

Brandon K. Buchanan

Sworn to before me this 17 day of March, 2021.

Notary Public

Courtney King
Notary Public
State of Florida
Comm# HH082990
Expires 1/20/2025

# EXHIBIT A

OPERATING AGREEMENT

OF

ITERATIVE INSTINCT UGP, LLC

THE UNDERSIGNED are executing this Operating Agreement (as amended from time to time hereafter pursuant to its terms, this "Agreement") as of this 31st day of May, 2016, for the purpose of forming a limited liability company (the "Company") pursuant to the provisions of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "Delaware Act"), and do hereby agree as follows:

1. Name; Formation.  The name of the Company shall be Iterative Instinct UGP, LLC, or such other name as the Members may from time to time hereafter designate.  The Company was formed upon the execution and filing of a certificate of formation of the Company with the Secretary of State of the State of Delaware setting forth the information required by Section 18-201 of the Delaware Act.

2. Definitions:  In addition to terms otherwise defined herein, the following terms have the meanings set forth below:

"Commitment" means, with respect to each Member, the amount as reflected on Schedule 1 hereto, as such Schedule 1 may be modified from time to time to reflect increases or decreases in a Member's Commitment.

"Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company or any other event causing dissolution of the Company under Section 18-801 of the Delaware Act.

"Members" means Brandon Buchanan, Chris Dannen and all other Persons admitted as additional or substituted members pursuant to this Agreement, for so long as they remain Members.  Reference to a "Member" means any one of the Members.

"Person" means an individual, a partnership, a corporation, a limited liability company, an associate, a joint stock company, a trust, a joint venture or unincorporated organization or a governmental entity or any dependent agency or political subdicision thereof.

3. Purpose.  The purpose of the Company shall be to serve as the general partner of Iterative Instinct GP I, L.P. and to engage in any lawful business that may be engaged in by a limited liability company organized under the Delaware Act, as such business activities may be determined by the Members from time to time.

4. <u>Offices</u>.

(a) The principal office of the Company, and such additional offices as the Members may determine to establish, shall be located at such place or places inside or outside the State of Delaware as the Members may designate from time to time.

(b) The registered office of the Company in the State of Delaware is located at 1209 Orange Street in the City of Wilmington, County of New Castle, 19801. The registered agent of the Company for service of process at such address is The Corporation Trust Company.

5. <u>Members</u>. The name and business or residence address of each Member of the Company are as set forth on <u>Schedule I</u> attached hereto, as the same may be amended from time to time.

6. <u>Term</u>. The Company shall continue until dissolved and terminated in accordance with <u>Section 14</u> of this Agreement.

7. <u>Management of the Company</u>.

(a) The Members shall have the sole right to manage the business of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company.

(b) The Members may appoint such officers, who may but need not be Members, to such terms and to perform such functions as the Members shall determine in their sole discretion. The Members may appoint, employ or otherwise contract with such other Persons for the transaction of the business of the Company or the performance of services for or on behalf of the Company as the Members shall determine in their sole discretion. The Members may delegate to any such officer or other Person such authority to act on behalf of the Company as the Members may from time to time deem appropriate in their sole discretion.

(c) When the taking of such action has been authorized by the Members, any officer of the Company or any other Person specifically authorized by the Members, may execute any contract or other agreement or document on behalf of the Company and may execute and file on behalf of the Company with the Secretary of State of the State of Delaware any certificates of amendment to the Company's certificate of formation, one or more restated certificates of formation and certificates of merger or consolidation and, upon the dissolution and completion of winding up of the Company, at any time when there are fewer than two Members, or as otherwise provided in the Delaware Act, a certificate of cancellation canceling the Company's certificate of formation.

(d) The Members shall serve until they resign, die, become incapacitated or are removed. The affirmative vote or consent of all Members entitled to vote or consent shall be required to take or approve any proposed action, make any determination or provide any consent.

(e) Meetings of the Members for the transaction of such business as may properly come before such Members shall be held at such place, on such date and at such time as

the Members shall determine. Notice shall be given at least 12 hours prior to any meeting of the Members. Notice may be waived before or after a meeting or by attendance without protest at such meeting. Notice may be by e-mail, hand, telephone, telecopy, overnight courier or the U.S. mail and shall be deemed given when received. Members may participate in a meeting by means of telephone and such participation shall constitute presence in person at such meeting, other than for any requirement as to physical presence in a particular jurisdiction.

(f) Any action required or permitted to be taken by the Members at a meeting may be taken without a meeting, without prior notice, and without a vote, provided that written consents, setting forth all proposed actions to be taken at such meeting, are signed by all Members. Every written consent shall bear the date and signature of each Member who signs such consent.

(g) The Members may adopt such other procedures governing meetings and the conduct of business as they shall deem appropriate.

8. Capital Contributions. Each Member shall make capital contributions to the capital of the Company in an amount up to such person's Commitment. Capital contributions shall be made pro rata among all Members on the basis of their respective Commitments by contributing installments in cash when and as determined by the Members. Persons hereafter admitted as Members of the Company shall have a Commitment and make such such contributions of cash, property or services in an amount as shall be determined by the Members at the time of each such admission.

9. Assignments of Company Interest. No Member may sell, assign, pledge or otherwise transfer or encumber any of its interest in the Company or any beneficial interest therein (a "Transfer") to any other Person without the prior written consent of the Members. Any purported Transfer in violation of this Section 9 shall be null and void and shall not be recognized by the Company.

10. Withdrawal. No Member shall have the right to withdraw from the Company except with the consent of the Members and upon such terms and conditions as may be specifically agreed upon between the Members and the withdrawing Member. The provisions of Section 12 with respect to distributions upon withdrawal are exclusive, and no Member shall be entitled to claim any further or different distribution upon withdrawal under Section 18-604 of the Delaware Act or otherwise.

11. Additional Members. The Members shall have the sole right to admit additional Members upon such terms and conditions, at such time or times, and for such capital contributions as the Members shall in their sole discretion determine. In connection with any such admission, the Members shall amend Schedule I hereof to reflect the name, address and capital contribution of the additional Member.

12. Distribution and Allocations.

(a) Distributions. Distributions of cash or other assets of the Company shall be made at such times and in such amounts as the Members may determine. Unless the Members determine otherwise, distributions shall be made to (and profits and losses shall be allocated

among) the Members pro rata based on the Members' respective Commitments. Members who withdraw from the Company shall be entitled to such a pro rata distribution relating to any capital previously contributed and not withdrawn from the Company and the rights to such distributions from the Company shall inure to the benefit of the withdrawing Members' legal representative and assigns.

(b) Allocations of Profits or Losses.  Except as may be required by the Internal Revenue Code of 1986, as amended, each item of income, gain, profit, loss, deduction or credit to the Company shall be allocated among its Members in accordance with each Member's interest in the Company as determined for purposes of Section 12(a).

13. Return of Capital.  No Member shall have any liability for the return of any Member's capital contribution, which capital contribution shall be payable solely from the assets of the Company at the absolute discretion of the Members, subject to the requirements of the Delaware Act.

14. Dissolution.  Subject to the provisions of Section 15 of this Agreement, the Company shall be dissolved and its affairs wound up and terminated upon the first to occur of the following:

(a) The determination of all of the Members to dissolve the Company; or

(b) The occurrence of an Event of Withdrawal.

**[No Member of the Company shall by reason of such membership have any right to use for such Member's personal benefit the name Iterative Instinct or any derivative thereof by reason of such Member's membership in the Company, whether before or after the dissolution of the Company, it being understood and agreed that such name is the property of and owned by [_____]]**[1].

15. Continuation of the Company.  Notwithstanding the provisions of Section 14(b) hereof, the occurrence of an Event of Withdrawal shall not dissolve the Company if within ninety (90) days after the occurrence of such Event of Withdrawal, the business of the Company is continued by the agreement of all remaining Members.

16. Limitation on Liability.  The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.  The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on any Member for liabilities of the Company.

---

[1]  **i2**: Confirm.

17. <u>Indemnification of Officers, Employees and Agents</u>.

(a) Each Person who was or is made a party or is threatened to be made a party to or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "<u>proceeding</u>") by reason of the fact that he or she is or was a Member or an officer of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company or of a corporation, partnership, joint venture, trust or other enterprise, including a service with respect to an employee benefit plan (hereinafter an "<u>indemnitee</u>"), whether the basis of such a proceeding is alleged action in an official capacity as an officer, employee or agent or in any other capacity while serving as a manager, officer, employee or agent, shall be indemnified and held harmless by the Company to the fullest extent authorized by the Delaware Act (including indemnification for negligence, gross negligence and breach of fiduciary duty to the extent so authorized), as the Delaware Act exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than such law permitted the Company to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, excise taxes, or penalties and amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith.

(b) The right to indemnification conferred in <u>Section 17(a)</u> shall include the right to be advanced and be paid by the Company the expenses (including attorneys' fees) incurred in defending any proceeding in advance of its final disposition. The rights of indemnification in paragraphs (a) and (b) of this <u>Section 17</u> shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be an officer, employee or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators.

(c) The rights to indemnification and to the advancement of expenses conferred in this <u>Section 17</u> shall not be exclusive of any other right that any Person may have or hereafter acquire under any statute, agreement, vote of the Members or otherwise.

(d) The Company may maintain insurance, at its expense, to protect itself and any officer, employee or agent of the Company or another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under the Delaware Act.

(e) The Company may, to the extent authorized from time to time by the Members, grant rights to indemnification and to advancement of expenses to any employee or agent of the Company to the fullest extent of the provisions of this <u>Section 17</u> with respect to the indemnification and advancement of expenses of officers of the Company.

18. <u>Amendments</u>. This Agreement may be amended only upon the written consent of the Members, provided that no such amendment shall increase any Member's obligation to make contributions to the capital of the Company without the consent of each Member adversely affected thereby.

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of law rules thereof, and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Act.  If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision shall be ineffective only in such jurisdiction and only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

20. <u>Singular; Plural; Gender</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

21. <u>No Third Party Beneficiaries</u>.  No Person (including creditors of the Company) that is not a party hereto shall have any rights or obligations pursuant to this Agreement.  The provisions of this Agreement are intended to benefit the Members of the Company and, to the maximum extent not prohibited by applicable law, shall not be construed as conferring any benefit upon any creditor of the Company.  In no event shall any provision of this Agreement be enforceable for the benefit of any Person other than the Members of the Company and their respective successors and assigns.

22. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together shall constitute one agreement, and to the extent such agreement or instrument is signed and delivered by means of a facsimile machine or other electronic transmission, it will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*   *   *

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first written above.

MEMBERS:

_____
Brandon Buchanan

_____
Chris Dannen

**SCHEDULE I**

| Name and Address | Commitment |
|---|---|
| Brandon Buchanan<br>c/o Iterative Instinct UGP, LLC<br>15 Broad Street, #1601<br>New York, NY 10005 | $25,000.00 |
| Chris Dannen<br>c/o Iterative Instinct UGP, LLC<br>15 Broad Street, #1601<br>New York, NY 10005 | $25,000.00 |
| TOTAL | $50,000.00 |